**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **GOLDEN EAGLE RESOURCES II, LLC,** | : | |
| | : | |
| **Plaintiff,** | : | **Case No. 2:22-cv-02374** |
| | : | |
| **v.** | : | **Chief Judge Algenon L. Marbley** |
| | : | |
| **RICE DRILLING D, LLC,** | : | **Magistrate Judge Kimberly A. Jolson** |
| | : | |
| **Defendant.** | : | |

**OPINION & ORDER**

This matter is before the Court on Defendant's Motion to Dismiss (ECF No. 11) and Plaintiff's Motion for Leave to File Sur-Reply (ECF No. 19). For the reasons set forth below, Plaintiff's Motion for Leave (ECF No. 19) is **GRANTED IN PART and DENIED IN PART**; Defendant's Motion to Dismiss (ECF No. 11) is **DENIED**. Plaintiff is **ORDERED** to amend its Complaint within **fourteen (14) days**.

## I.     BACKGROUND

This case arises out of competing leases for natural resource rights in eastern Ohio. Plaintiff Golden Eagle Resources II, LLC ("Golden Eagle"), believes that it has the right to produce minerals from the Point Pleasant formation beneath a particular parcel of land in Belmont County. Much of that parcel is included in a drilling unit operated by Defendant Rice Drilling D, LLC ("Rice Drilling" or "Rice"), whose well has been producing oil and gas from the Utica and Point Pleasant formations since 2020. Golden Eagle alleges that, in drilling the well and producing from it, Rice Drilling has trespassed upon Golden Eagle's property and converted Golden Eagle's property; these claims implicate questions of how modern developments in hydraulic fracturing

1

have affected long-standing doctrines of common law, including the tort of trespass and the rule of capture.

## A. Factual Background

The dispute centers on 18.934 acres in Belmont County, acquired in 2011 by Jeremiah J. Gillespie (hereinafter, the "Property"). (*See* Compl. ¶ 5, ECF No. 3). Gillespie and his wife sold a 11.456 acre parcel of the Property in 2011 and the remaining 7.478 acres to a different buyer in 2014, but retained the subsurface oil, gas, and mineral rights to both parcels. (*Id.* ¶¶ 6, 10). The drilling rights to oil and gas from the Marcellus Shale and Utica Shale formations were leased to Paloma Partners III ("Paloma") in 2013. (*Id.* ¶¶ 7–9). In the lease agreement, Gillespie and his wife explicitly reserved the rights to natural resources produced from the geologic formations between the surface and the top of the Marcellus Shale, between the bottom of the Marcellus Shale to the top of the Utica Shale formation, and below the base of the Utica Shale.[1] (*Id.* ¶ 8). Paloma, in turn, assigned the drilling rights in the lease to Defendant Rice Drilling in 2015. (*Id.* ¶ 13). Separately, the Gillespies conveyed the mineral rights to the Property to Westhawk Minerals, LLC, who then conveyed the rights to Golden Eagle in 2015. (*Id.* ¶¶ 11–12).

On May 21, 2019, Rice Drilling received a well permit from the Ohio Department of Natural Resource ("ODNR") to drill an oil and gas well, pursuant to the rights it had been assigned by Paloma. (*Id.* ¶ 14). This well was called the "Big Tex" well,[2] and assigned API well number

---

[1] The Marcellus Shale is a formation of sedimentary rock, dating back to the Middle Devonian Age (i.e., roughly 300 million years ago), which lies underneath much of the northern Appalachian Basin, including New York, Pennsylvania, eastern Ohio, West Virginia, and western Maryland. *See Marcellus Shale*, AM. PETROL. INST., https://www.api.org/oil-and-natural-gas/energy-primers/hydraulic-fracturing/marcellus-shale. The Marcellus Shale is notable for its abundance of natural gas, and production of natural gas from the Marcellus Shale through hydraulic fracturing has increased rapidly in the last fifteen years. *The Marcellus Shale, Explained*, STATEIMPACT PA., NPR, https://stateimpact.npr.org/pennsylvania/tag/marcellus-shale/. The Utica Shale is an even older, larger, and deeper formation of shale rock, which extends into the subsurface of Quebec, Ontario, Kentucky, and Tennessee. It, too, contains an abundance of recoverable gas and oil.

[2] The full name of the well is Big Tex SCL6H13, according to ODNR's well database.

34-013-2-1421-00-00.[3]  (*Id.*).  The well is part of the Big Tex 6 drilling unit; in the as-drilled plat

map filed by Rice Drilling with the ODNR on December 31, 2019, the drilling unit overlaps with

parts of the Property — specifically, the entirety of the 7.478-acre parcel, which is labeled on the

map as Tract 113, and 9.053856 acres of the 11.456-acre parcel, which is labeled on the map as

Tract 114.[4]  In 2020, Rice Drilling began producing gas from the "Utica/Point Pleasant" formations

from the well, according to the well completion report it submitted to the ODNR.  (*Id.* ¶ 16; *see*

Ex. 6, ECF No. 3 at 24–26).  The report also lists the following geological formation information

for the drilling unit: the Marcellus Shale extends from 5225 feet below the surface to 5283 feet;

the Utica formation from 9268 feet below the surface to 9395 feet; and the Point Pleasant formation

begins at 9395 feet below the surface.[5]  (*See* Ex. 6, ECF No. 3 at 25).  Since the completion of the

well, Rice Drilling has produced 4,659,592 MCF of gas in 2020, 8,672,237 MCF of gas in 2021,

and at least 3,134,486 MCF of gas in 2022.[6]

## B.    Procedural Background

Plaintiff Golden Eagle filed its complaint in this action in the Belmont County Court of

Common Pleas on May 5, 2022, pursuing damages and injunctive relief for trespass and

conversion.  (*See* Compl., ECF No. 1-1).  Defendant Rice Drilling timely removed the case to

---

[3] An API well number is a unique number assigned to every oil and gas well across the country, which allows state agencies to identify and track oil and gas wells. *See* API Well Number Explanation, W. VA. DEP'T OF ENV'T PROT., www.dep.wv.gov/oil-and-gas/GI/API_Explanation/Pages/default.aspx.  The API number is determined according to industry standard set by the American Petroleum Institute.  The first number, here '34,' is a state code, identifying that the Big Tex well is located in Ohio.

[4] The Court hereinafter refers to the two parcels as Tracts 113 and 114, respectively, for simplicity and consistency.

[5] Although the report lists Utica and Point Pleasant as separate formations, Rice Drilling suggests that the Point Pleasant is part of the Utica and that its lease of the Utica Shale includes the right to produce from the Point Pleasant formation. (*See* Reply in Supp. of Mot. to Dismiss at 14 n.9, ECF No. 18).

[6] The full-year production total for 2022 is not yet available, as Rice Drilling has only reported gas production for the first three (3) quarters of 2022 to the ODNR.  An MCF is a unit for measuring natural gas, referring to one thousand cubic feet.  The other common way to measure natural gas is by reference to its heat content (i.e., British thermal units, or "BTUs").  *See Frequently Asked Questions*, U.S. ENERGY INFO. ADMIN. (June 1, 2021), www.eia.gov/tools/faqs/faq/php?id=45&t=8.

federal court, alleging diversity jurisdiction.[7]  In June 2022, Defendant filed its Motion to Dismiss (ECF No. 11), for failure to state a claim.  Also before the Court is Plaintiff's Motion for Leave to File Sur-Reply (ECF No. 19), which requests permission to file further briefing regarding Defendant's motion.  Both motions are ripe for this Court's review.

## II.      STANDARD OF REVIEW

A motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(6) operates to evaluate the sufficiency of the complaint and permits dismissal of a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  Such a motion "is a test of the plaintiff's cause of action as stated in the complaint, not a challenge to the plaintiff's factual allegations."  *Golden v. City of Columbus*, 404 F.3d 950, 958–59 (6th Cir. 2005).  Accordingly, the Court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff."  *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 903 (6th Cir. 2009) (quoting *Jones v. City of Cincinnati*, 521 F.3d 555, 559 (6th Cir. 2008)).  Although the court's primary focus will be on the allegations in the complaint, the court may also consider "any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to the defendant's motion so long as they are referred to in the Complaint and are central to the claims contained therein."  *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).

To survive a motion to dismiss, "the plaintiff must allege facts that, if accepted as true, are sufficient to raise a right to relief above the speculative level and to state a claim to relief that is

---

[7] Defendant notes that it is a Delaware limited liability company ("LLC"), whose sole member is Rice Drilling B, LLC.  Rice Drilling B, LLC, is, in turn, a Delaware LLC, whose sole member is EQT RE, LLC, also a Delaware LLC; the sole member of EQT RE, LLC, is EQT Production Company, which is a Pennsylvania corporation.  (Notice of Removal ¶ 7, ECF No. 1).  *See Delay v. Rosenthal Collins Grp., LLC*, 585 F.3d 1003, 1005 (6th Cir. 2009).

plausible on its face." *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009) (internal quotations omitted) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is considered plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). And though the court "must accept all well-pleaded factual allegations in the complaint as true," the court "need not accept as true a legal conclusion couched as a factual allegation." *Id.* (quoting *Twombly*, 550 U.S. at 555) (internal quotations omitted).

### III.     LAW & ANALYSIS

### A.     Preliminary Matters

This Court first considers Golden Eagle's Motion for Leave to File Sur-Reply (ECF No. 19), as granting or denying the motion would affect what arguments are before the Court for consideration when ruling on the motion to dismiss. While the Federal Rules of Civil Procedure do not explicitly contemplate the filing of sur-replies, the Court's Local Rules permit additional memoranda "upon leave of court for good cause shown." S.D. Ohio Civ. R. 7.2(a)(2). The Rules do not define good cause, but the Sixth Circuit has noted that additional filings "may be allowed in the appropriate circumstances, especially '[w]hen new submissions and/or arguments are included in a reply brief, and a non-movant's ability to respond to the new evidence has been vitiated.'" *Key v. Shelby Cnty.*, 551 F. App'x 262, 265 (6th Cir. 2014) (quoting *Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 481 (6th Cir. 2003)); *see also Comtide Holdings, LLC v. Booth Creek Mgmt. Corp.*, 2010 WL 4117552, at *4 (S.D. Ohio Oct. 19, 2010) ("[T]his Court has consistently held that in order for a party to be given permission to file a sur-reply, the reply brief must raise new grounds that were not presented as part of the movant's initial motion." (citations omitted)).

5

This is considered good cause because "arguments raised for the first time in a reply brief . . . deprive[] the [opposing] party of its opportunity to address the new arguments" in the absence of a sur-reply. *Cooper v. Shelby Cnty., Tenn.*, 2010 WL 3211677, at \*3 n.14 (W.D. Tenn. Aug. 10, 2010); *cf. Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002).

Ultimately, this Court has "broad discretion to manage its docket" in determining whether a movant has shown good cause. *ACLU of Kentucky v. McCreary Cnty.*, 607 F.3d 439, 451 (6th Cir. 2010) (citing *Reed v. Rhodes*, 179 F.3d 453, 471 (6th Cir. 1999)). Courts in the Southern District of Ohio may permit a party to file a sur-reply even without showing good cause if it does not result in prejudice toward the opposing party. *See Nat'l City Bank v. Aronson*, 474 F. Supp. 2d 925, 930 (S.D. Ohio 2007). Moreover, the Sixth Circuit has a "strong preference that claims be adjudicated on their merits." *Coleman v. Shoney's, Inc.*, 79 F. App'x 155, 157 (6th Cir. 2003) (citing *Jourdan v. Jabe*, 951 F.2d 108, 110 (6th Cir. 1991)). Any evidence used to support a sur-reply that is deemed permissible must, however, "be limited to that needed to rebut the positions argued in memoranda in opposition." S.D. Ohio Civ. R. 7.2(d).

Here, Plaintiff Golden Eagle asserts that permission to file a sur-reply is warranted because Rice Drilling has raised new arguments in its reply and has mischaracterized the cases it cites. (Mot. for Leave at 1–2, ECF No. 19). As an initial matter, a party's desire to point out mischaracterizations or misrepresentations of caselaw, even if helpful, does not provide grounds for the filing of sur-replies. *See Little Hocking Water Ass'n, Inc. v. E.I. Du Pont de Nemours & Co.*, 2014 WL 12651139, at \*2 (S.D. Ohio Oct. 31, 2014). It is the Court's responsibility, after all, to sift through the parties' representations of law and fact and to determine which representations to credit and which to set aside. More importantly, the reply brief before the Court does raise new arguments not previously mentioned in Rice Drilling's motion to dismiss, though

Rice Drilling asserts that this is because Plaintiff's response to the motion to dismiss included "previously undisclosed theories" necessitating rebuttal. (Resp. in Opp'n to Mot. for Leave at 2, ECF No. 20; *see also id.* (claiming that Plaintiff has "pivoted its legal theories from those in the Complaint to those in the Response" without seeking leave to amend its Complaint)). A substantial portion of the arguments in both Rice Drilling's Reply (ECF No. 18) and Golden Eagle's Sur-Reply (ECF No. 19-1) address the "new" legal theories and extend beyond the four corners of the arguments in the motion to dismiss. In short, without the sur-reply, Golden Eagle has not had a chance to address the subjects of Rice Drilling's reply brief (notwithstanding Rice's assertion that those topics are inappropriate as outside the Complaint).

Whether Golden Eagle has impermissibly expanded its arguments beyond the scope of its pleadings in the Complaint and whether those arguments stand up to scrutiny at the motion to dismiss stage are questions the Court prefers to address on the merits. *See Coleman*, 79 F. App'x at 157. As the Reply raises new arguments, the Court **GRANTS IN PART and DENIES IN PART** Plaintiff's Motion for Leave to File Sur-Reply (ECF No. 19). The Court will consider Plaintiff's Sur-Reply (ECF No. 19-1) to the extent that it rebuts arguments raised for the first time in Defendant's Reply (ECF No. 18); the Court will not, however, consider the portion of Plaintiff's Sur-Reply dedicated solely to explaining how Rice Drilling has purportedly misread, misstated, or mischaracterized case law.

### B.     Motion to Dismiss

Plaintiff Golden Eagle's Complaint (ECF No. 3) alleges two causes of actions: trespass and conversion. The Court addresses Defendant Rice Drilling's arguments as to why each fails to state a claim in turn.

### 1. Trespass

Under Ohio law, "[a] trespass is an interference or invasion of a possessory interest in property. A person or entity is liable to another for trespass if the person or entity intentionally enters upon land in the possession of another or causes a thing or third person to do so." *Abraham v. BP Exploration & Oil, Inc.*, 778 N.E.2d 48, 51 (Ohio Ct. App. 2002) (first citing *Crown Prop. Dev., Inc. v. Omega Oil Co.*, 681 N.E.2d 1343, 1350 (Ohio Ct. App. 1996) (internal citations omitted); then citing *Baker v. Shymkiv*, 451 N.E.2d 811, 813–14 (Ohio 1983) (citing RESTATEMENT (SECOND) OF TORTS § 158)). Here, the possessory interest in property alleged by Golden Eagle is the mineral rights to the Point Pleasant formation beneath the Property, which it received from the Gillespies by way of Westhawk Minerals, LLC. In the Complaint, Golden Eagle simply states that "Rice Drilling physically invaded and unlawfully entered a formation below the Utica owned by Golden Eagle, specifically, the Point Pleasant formation." (Compl. ¶ 23, ECF No. 3). And this invasion, according to Golden Eagle, was unauthorized because the oil and gas lease assigned to Rice Drilling, pursuant to which it drilled the Big Tex well, "explicitly withheld the right to drill or produce from the Point Pleasant formation and only allowed the lessee to penetrate and drill through unleased shallower formations," such as the Marcellus and Utica formations. (*Id.* ¶ 24).

In the Complaint, Golden Eagle does not explain *how* Rice Drilling has invaded and unlawfully entered the section of the Point Pleasant formation beneath the Property. But three possibilities emerge from the briefing: (1) Rice Drilling drilled into Plaintiff's property; (2) Rice Drilling improperly included Plaintiff's property in pooling together the Big Tex 6 drilling unit; or (3) Rice Drilling injected hydraulic fracturing fluids into Plaintiff's property. The Court first explains why the first possibility is foreclosed by the facts presented and the second option is

incorrect as a matter of law, before turning to the injectate theory of trespass, which presents the closest question.

The first, and most traditional, theory of trespass contemplated by the Complaint alleges that Rice Drilling physically invaded Golden Eagle's property by drilling the Big Tex well through the property (hereinafter, the "wellbore theory"). This theory is the subject of Rice Drilling's initial assertion that the Complaint fails to state a claim on which relief may be granted. (*See* Mot. to Dismiss at 3–5, ECF No. 11). The as-drilled plat map for the Big Tex well,[8] which was filed as an exhibit to Plaintiff's Complaint, shows that the wellbore never passes under Tracts 113 and 114. (*See* Ex. 5, ECF No. 3 at 20, 22). As its well does not enter Golden Eagle's property, Rice Drilling asserts that it too has never entered Golden Eagle's property — without which there is no trespass claim. But it is not entirely clear whether this theory formed the basis of Golden Eagle's Complaint. On the one hand, Golden Eagle has attempted to rebut the factual basis for Rice Drilling's arguments against the wellbore theory of trespass. (Resp. in Opp'n to Mot. to Dismiss at 5, ECF No. 13). On the other hand, Golden Eagle has stated elsewhere that it should have been obvious to Rice Drilling from the Complaint and its exhibits that the trespass claim did not rely on the wellbore theory. (*See* Sur-Reply at 2, ECF No. 19-1).

In the end, it does not make much difference whether Golden Eagle intended to rely on the wellbore theory: the theory fails to state a trespass claim based on the factual allegations presented. As noted, the plat map demonstrates that the Big Tex wellbore did not intersect or pass under Golden Eagle's property. Golden Eagle suggests that the plat map should not be accepted as an accurate depiction of the wellbore by this Court, despite the "well-settled rule that when a written

---

[8] An as-drilled plat map shows the path of the well drilled and its relationship with the surrounding properties, their boundary lines, and other relevant land features.

instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations." *N. Ind. Gun & Outdoor Shows, Inc. v. City of South Bend*, 163 F.3d 449, 454 (7th Cir. 1998) (internal citations omitted); *see also Mengel Co. v. Nashville Paper Prod. & Specialty Workers Union, No. 513*, 221 F.2d 644, 647 (6th Cir. 1955) ("If inconsistent with the allegations of the complaint, the exhibit controls."). And it is true that there are certain situations where a plaintiff has not "adopt[ed] every word within the exhibits as true for purposes of pleading simply because the documents were attached to the complaint to support an alleged fact," *N. Ind. Gun*, 163 F.3d at 455, depending on "why a plaintiff attached the documents, who authored the documents, and the reliability of the documents." *Id*. Thus, letters that are unreliable, are not intended to demonstrate the truth of their contents, or do not form the basis of a plaintiff's allegations would not warrant a presumption of truth. *See id.* at 455–56; *see also Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 442 (6th Cir. 2012) (noting that the blanket adoption rule of the content of exhibits "makes much less sense when . . . the exhibit is not a legally dispositive document" (internal citation omitted)).

But here, Golden Eagle does little to explain why the plat map fits the exception and not the well-settled rule. Although the plat map was filed by Rice Drilling, it was created in part by a third-party, stamped by a registered surveyor, and is maintained as an accurate record by the State; in short, it bears all the indicia of reliability. (*See* Reply in Supp. of Mot. to Dismiss at 5, ECF No. 18). Nor does Golden Eagle assert that it has attached the map to its Complaint for any reason but for the truth of the contents. After dismissing the plat map as a Defendant-created document that the Court need not rely upon, Golden Eagle then claims that "Rice Drilling included portions of the Property within the drilling unit" — presumably relying upon the plat map, which shows that the Big Tex 6 drilling unit crosses Tracts 113 and 114, as supporting evidence. (Resp. in Opp'n

10

to Mot. to Dismiss at 9, ECF No. 13). Golden Eagle cannot both use the as-drilled plat map as the basis for its allegations and assert, in the same breath, that it is inaccurate. Given the reliability of the plat map and its central role in Plaintiff's allegations, the Court accepts the plat map and its depiction of the path of the Big Tex wellbore as true. Because that path does not cross Tracts 113 and 114, the wellbore theory fails to state a trespass claim upon which Golden Eagle may be granted relief.

The second theory of trespass looks to the related concepts of pooling and correlative rights. Correlative rights are meant to remedy the problems caused by the common law 'rule of capture,' which enables "the owner of a parcel of land [to] acquire title to the oil and gas produced from [a] well [on that parcel] although that oil and gas may have migrated from adjoining lands." *Barnes v. Rsrv. Energy Expl.*, 2016-Ohio-4805, ¶ 29, 68 N.E.3d 133, 141 (Ohio Ct. App. 2016) (citing *Nw. Ohio Nat. Gas Co. v. Ullery*, 67 N.E. 494 (1903)). The problem with the rule of capture, however, is that the only remedy for the owner of the adjoining land is to dig her own well so that she can benefit from her oil and gas before it is all captured by her neighbor, but "with each new drill site the reservoir loses pressure, leaving much of the oil unobtainable." *Paczewski v. Antero Res. Corp.*, 2019-Ohio-2641, ¶ 3, 2019 WL 2722600, at *1 (Ohio Ct. App. June 19, 2019). In short, the rule of capture incentivizes inefficient drilling and development of natural resources. The doctrine of correlative rights arose to combat these misaligned incentives, by ensuring that each landowner has a "reasonable opportunity . . . to recover and receive the oil and gas in and under the person's tract or tracts . . . without having to drill unnecessary wells or incur other unnecessary expense." Ohio Rev. Code § 1509.01(I). As relevant to this case,[9] Ohio

_____

[9] Setting minimum distances between wells is another way Ohio has promoted correlative rights. *See* Ohio Rev. Code §§ 1509.021.

11

promotes correlative rights by allowing for pooling: landowners can pool together adjoining properties to form a single drilling unit,[10] and all production of oil, gas, or minerals from anywhere in the pooled drilling unit is considered to have been produced from the unit as a whole no matter where the actual well was drilled.  *See* OHIO REV. CODE §§ 1509.26–.27.   Thus, a landowner need not dig a new well to protect her fair share of the resources underneath her property from being siphoned off by her better-resourced or faster-moving neighbor pursuant to the rule of capture; in a pooled drilling unit, the benefits from any well are distributed across all landowners in the pool.

The idea of pooling rests on a bit of fiction about how resources are produced.  To simplify, pooling assumes that oil and gas produced from one part of the pooled unit is actually "produced from under each separate surface tract of land included" in the unit — which is what justifies giving proceeds to all participants in the pool for the oil and gas produced from a particular parcel within the pool.  *Kysar v. Amoco Prod. Co.*, 93 P.3d 1272, 1280 (N.M. 2004) (quoting *Miller v. N.R.M. Petrol. Corp.*, 570 F. Supp. 28, 30 (N.D. W.Va. 1983)); *see also Cheyenne-Arapaho Tribes of Okla. v. United States*, 966 F.2d 583, 585 (10th Cir. 1992) (citing *Kenai Oil & Gas, Inc. v. Dep't of Interior*, 671 F.2d 383, 384 (10th Cir. 1982)).   But that assumption might not reflect reality. Even if two properties lie above a common pool of oil or gas, it is possible that a well on one property will only (or primarily) drain oil or gas from below that property, and not from the part of the common pool below the other property.  Thus, the pooling concept requires a leap of faith, an assumption unmoored from what actually occurs on or under the ground.

---

[10] One reason pooling is useful is because Ohio has set minimum drilling unit sizes depending on factors such as the depth of the well.  *See* OHIO REV. CODE § 1509.24.  Thus, if someone or some entity wants to drill a vertical well deeper than 4,000 feet, she must assemble a drilling unit of 40 acres.  But if she does not have that amount of land herself, she can try to pool together land from adjoining landowners (or lease the oil and gas rights) to meet the 40-acre minimum.

Golden Eagle relies on this leap of faith in asserting that the improper inclusion of its property in the Big Tex 6 unit constitutes a trespass.  As the argument goes, according to the principles underlying pooling, the improper inclusion of Tracts 113 and 114 in the Big Tex 6 unit means that any oil and gas produced by Rice Drilling from the unit general is assumed to have been produced from every tract in the unit, including from Tracts 113 and 114 — thus trespassing on Golden Eagle's property.  (*See* Resp. in Opp'n to Mot. to Dismiss at 9–10, ECF No. 13).  But this argument falls short as a matter of law.  In the first instance, the draining of oil and gas is not a trespass, which requires a physical invasion.  While hydraulic fracturing may constitute the requisite physical invasion, *see infra*, mere inclusion of Plaintiff's property within a drilling unit does not "necessarily indicate[] an intent to hydraulically fracture those portions of the Property" as there are other reasons to include a tract of land in a pooling unit.  (*Id.* at 10).  A driller might, for example, include a tract in the pool simply to meet the minimum drilling unit size while limiting the production to other tracts of the drilling unit.  *See* OHIO REV. CODE § 1509.24.  And even if inclusion *did* indicate an intent to frack, intent does not state a trespass claim.  Finally, the only case that Golden Eagle cites in support of the proposition that "Ohio courts have specifically held that improper inclusion in a drilling unit constitutes a trespass" does not in fact arrive at that conclusion.  (Resp. in Opp'n to Mot. to Dismiss at 9, ECF No. 13 (citing *Bond v. Halcon Energy Props.*, 2017-Ohio-7754, 2017 WL 4220361 (Ohio Ct. App. Sept. 21, 2017))).  To the contrary, the trespass claim in *Bond* turned on whether an oil and gas lease gave a drilling company the right to produce only oil and gas, or if it also included mineral rights, and the decision rested on a question of contract interpretation (i.e., whether "well unit for oil" and "well unit for gas" are ambiguous terms) without discussing trespass.  *Id.* at *2, *3–*4.  Golden Eagle cannot rely, in

other words, on the inclusion of Tracts 113 and 114 in the Big Text 6 drilling unit to form the basis of its trespass claim.[11]

The third and final theory of trespass debated by the parties is the injectate theory. This theory, as the Court understands it, claims that Rice Drilling has committed subsurface trespass on Golden Eagle's property by injecting fluids into the Point Pleasant formation below the Property as part of the hydraulic fracturing process. Hydraulic fracturing (also known as "fracking") is the process of "producing fractures in the rock formation that stimulate the flow of natural gas and oil . . . by pumping large quantities of fluids at high pressure down a wellbore and into the target rock formation" and is the typical approach used to extract natural gas from the Marcellus Shale formation. *The Process of Unconventional Natural Gas Production*, EPA, https://www.epa.gov/uog/process-unconventional-natural-gas-production. The injected fluid ("injectate") typically consists of water, proppants like "sand, ceramic pellets or other incompressible particles," and chemical additives. *Id.* Golden Eagle suggests that Rice Drilling may have "propel[led] fracking fluids and proppants beneath the surface of the Property" into the portion of the Point Pleasant formation where Golden Eagle owns the mineral rights, and thus "interfere[d] with the reasonable and foreseeable use of the subsurface." (Resp. in Opp'n to Mot. to Dismiss at 7, 8, ECF No. 13).

The parties disagree vigorously on whether Ohio law recognizes a subsurface injectate theory of trespass. Central to the parties' dispute is the Supreme Court of Ohio's decision in

_____

[11] Additionally, Rice Drilling suggests that Golden Eagle must either admit that Rice Drilling leased the right to drill the Point Pleasant formation beneath the Property or admit that that segment of the formation is outside the Big Tex 6 drilling unit and thus cannot sustain a claim for trespass. (*See* Reply in Supp. of Mot. to Dismiss at 14–15, ECF No. 18). But this is a false dilemma: Golden Eagle may argue that Rice Drilling does not have the right to drill the Point Pleasant formation beneath the Property but has improperly pooled it as part of the Big Tex 6 drilling unit. And, in fact, that appears to be the essence of Golden Eagle's "improper inclusion" trespass claim.

14

*Chance v. BP Chems., Inc.*, 670 N.E.2d 985 (Ohio 1996).  Rice Drilling asserts that this case stands for the proposition that Ohio has adopted the so-called "negative rule of capture," which allows a landowner to "inject into a formation substances which may migrate through the structure to the land of others, even if it thus results in [] displacement under such land . . . ."  *Chance*, 670 N.E.2d at 991 (quoting *R.R. Comm'n of Texas v. Manziel*, 361 S.W.2d 560, 568 (Tex. 1962) (internal citations omitted)).  But *Chance* only mentions the "negative rule of capture" as a doctrine that one party advocated for, and then sets it aside as inapplicable to the facts of the case; it neither adopts nor disposes of the rule as a matter of Ohio law.[12]  *See generally id.*  And it does not appear that other Ohio courts have ever adopted the doctrine, or even discussed it except in *Chance* and the lower court decision in the same case.[13]

Plaintiff's reliance on *Chance* to support the idea that Ohio law recognizes subsurface injectate trespass rests on a more solid foundation.  In *Chance*, the Supreme Court of Ohio recognized that landowners' "subsurface rights in their properties include the right to exclude invasions of the subsurface property that actually interfere with appellants' reasonable and foreseeable use of the subsurface."  *Id.* at 992.  Rice Drilling argues that the holding in *Chance*

---

[12] Rice Drilling asserts that "the Ohio Supreme Court would apply the negative Rule of Capture in this case." (Reply in Supp. of Mot. to Dismiss at 7, ECF No. 18).  The Court is not so certain; the plain implication of *Chance* is that the negative rule of capture was inapplicable to the facts of the case without deciding whether the negative rule of capture would have been applicable to a different set of facts.  The Supreme Court of Ohio did not weigh the merits or implications of adopting the negative rule of capture for oil and gas cases in Ohio, or state that it would have applied the negative rule of capture had *Chance* been an oil and gas case.  The fact that the *Chance* court recognized a subsurface injectate theory of trespass further militates against Rice's assertion.

[13] The parties cite a number of cases from other states and other federal courts as persuasive authority.  (*See, e.g.*, Resp. in Opp'n to Mot. to Dismiss at 5–6, ECF No. 13; Reply in Supp. of Mot. to Dismiss at 9–11, ECF No. 18).  Because the Court reads *Chance* as recognizing subsurface injectate trespass claims under certain circumstances, the Court does not address these cases and notes only that the persuasive authority does not appear decisive.  *Compare Briggs v. Sw. Energy Prod. Co.*, 224 A.3d 334, 352 (Pa. 2020) (noting that a fracking trespass claim may be cognizable if plaintiff does not only rely on "mere drainage of minerals" or "inference based on generalized characteristics of a particular drilling method" but "use[s] at least *some* words alleging physical injury" (citing *Frankel v. Donehoo*, 158 A. 570, 572 (1931)) (emphasis in original)), *with Coastal Oil & Gas Corp. v. Garza Energy Tr.*, 268 S.W. 3d 1, 11– 12 (Tex. 2008) (making no exception to the rule of capture for hydraulic fracturing).

should be limited to "the unique facts" of that case, but does not explain how the facts in *Chance* are so different from the facts in this case as to preclude the application of the *Chance* rule, which was already narrower than the previous absolute right to exclude.[14]  *See id.* at 992–93; *see also Baatz v. Columbia Gas Transmission, LLC*, 929 F.3d 767, 773 (6th Cir. 2019) (noting that the definition of possessory interest in *Chance*, and consequently the subsurface theory of trespass, "applies in contexts other than the specific setting presented in that case," including in oil and gas cases (citing *Lueke v. Union Oil Co. of Cal.*, 2000 WL 1545077, at *6–*7 (Ohio Ct. App. Oct. 20, 2000); *Baker v. Chevron USA, Inc.*, 533 F. App'x 509, 521 (6th Cir. 2013)).  Rice Drilling also objects that, even if a claim for subsurface injectate is cognizable, it will fall short without allegations of physical damage or interference with use.  (Reply in Supp. of Mot. to Dismiss at 8, ECF No. 18 (quoting *Chance*, 670 N.E.2d at 993, and citing *Baatz*, 929 F.3d at 773 (6th Cir. 2019))).

Although Golden Eagle has adequately specified that "fracturing the rock formations below the Property and leaving behind proppants designed to allow gas to escape from Plaintiff's property to Defendant's well certainly interferes with the reasonable and foreseeable use of the subsurface" in its briefing to state a claim for subsurface injectate trespass, the Complaint itself is barren of any such allegations.  (Resp. in Opp'n to Mot. to Dismiss at 8, ECF No. 13; *see generally* Compl., ECF No. 3).  In fact, the allegations in the Complaint do not appear to reference fluids, proppants, or any hydraulic materials relevant to a subsurface injectate theory of trespass.  (*Cf.* Resp. in Opp'n to Mot. for Leave to File Sur-Reply at 2, ECF No. 20 (alleging that "Plaintiff

---

[14] The *Chance* decision notes that the subsurface injectate theory is difficult to establish in reality, based on the inherent complexity of the facts of hydraulic fracturing cases — including factors such as the actual location of the injectate, how the injectate migrates laterally underground, the diffusion of injectate in brine, etc.  *See id.* at 992. But these are all factors that the Court considers at summary judgment or at trial, not at the motion to dismiss stage.

pivoted its legal theories from those in the Complaint to those in the Response")).  This deficiency may ultimately be rooted in the different pleading standards required by state and federal courts. This case was initially filed by Golden Eagle in state court, and Ohio is a notice-pleading state, which has adhered to the "no set of facts" pleading standard even after *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), heightened the federal pleading standard.  *See Tuleta v. Med. Mut. of Ohio*, 2014-Ohio-396, ¶¶ 23–31, 6 N.E.3d 106, 113–115 (Ohio Ct. App. 2014) (discussing Ohio's pleading standards in the wake of *Twombly* and *Iqbal* and concluding, upon a survey of state appellate court decisions, that "until the Ohio Supreme Court adopts a new pleading standard or the Ohio Rules of Civil Procedure are changed, Ohio remains a notice-pleading state"); *cf. Maternal Grandmother v. Hamilton Cnty. Dep't of Job and Fam. Servs.*, 167 Ohio St.3d 390, 2021-Ohio-4096, ¶¶ 24–29, 193 N.E. 536, 541–542 (Ohio 2021) (DeWine, J., concurring in the judgment) (suggesting that Ohio courts should move towards federal standard as the "no set of facts" standard "is often parroted [but] has not been strictly applied by this court or other courts in this state" and "is in tension with Civ. R. 8's requirement").  Under the "no set of facts" standard, a complaint "should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  *O'Brien v. Univ. Cmty. Tenants Union, Inc.*, 327 N.E.2d 242, 245 (Ohio 1975) (quoting *Conley v. Gibson*, 355 U.S. 41, 45 (1957)).

While Plaintiff's trespass claim is sufficient under the more liberal state standard, "no set of facts" is not the standard that controls proceedings in federal court anymore.  The federal rules, including the federal pleading standard,[15] apply equally to cases initiated in federal court as to civil

---

[15] Golden Eagle notes that the Sixth Circuit has recognized the more liberal Ohio pleading standard, citing to *Mid-Continent Ins. Co. v. Coder*, 563 F. App'x 422, 427 (6th Cir. 2014).  (Resp. in Opp'n to Mot. to Dismiss at 4, ECF No. 13).  But *Coder* discussed the state pleading standard in the context of the scope of allegations in a state

actions that are removed from state court. FED. R. CIV. P. 81(c)(1); *see Vanhook v. Somerset Health Facilities, LP*, 67 F. Supp. 3d 810, 815–17 (E.D. Ky. 2014) (collecting cases on the impact of *Twombly* and *Iqbal* on cases removed from state court). Golden Eagle admits that its allegations "do not specify whether the alleged physical invasion resulted from the invasion of the wellbore under the property or the invasion of hydraulic fracturing fluids and proppants under the property." (Sur-Reply at 2–3, ECF No. 19-1). Thus, Golden Eagle's trespass claim — with its lack of factual allegations regarding injectate or interference with anticipated use — falls short of the federal pleading standard. As this deficiency results from the difference in state and federal standards and as this case was removed by Defendant Rice Drilling, the Court **GRANTS** Plaintiff Golden Eagle **fourteen (14) days** to amend its Complaint.

## 2. Conversion

Golden Eagle's second cause of action is conversion: the Complaint alleges that Rice Drilling has wrongfully converted oil and gas produced from the Point Pleasant formation, below the base of the Utica Shale formation, that should be Golden Eagle's. (Compl. ¶¶ 30–31, ECF No. 3). The common law tort of conversion "is generally defined as 'the wrongful control or exercise of dominion over property belonging to another inconsistent with or in denial of the rights of the owner.'" *Eva v. Midwest Nat'l Mortg. Bank, Inc.*, 143 F. Supp. 2d 862, 896 (N.D. Ohio 2001) (quoting *R.J. Wildner Contracting Co., Inc. v. Ohio Turnpike Comm'n*, 913 F. Supp. 1031, 1043 (N.D. Ohio 1996)). The elements of conversion, under Ohio law, are "(1) the plaintiff's ownership or right to the possession of the property at the time of the conversion; (2) the defendant's

---

court complaint from a separate action; it did not discuss the pleading standard required by federal courts for cases removed from state court. *See Coder*, 563 F. App'x at 425.

conversion by a wrongful act or disposition of plaintiff's property rights; and (3) damages." *Id.* at 896–97 (citing *NPF IV, Inc. v. Transitional Health Servs.*, 922 F. Supp. 77, 81 (S.D. Ohio 1996)).

Here, Rice Drilling moves to dismiss Plaintiff's conversion claim on the basis of the rule of capture.[16]  The rule of capture, as noted above, "states that the owner of a parcel of land can acquire title to the oil and gas produced from that well although that oil and gas may have migrated from adjoining lands." *Barnes*, 68 N.E.3d at 141 (citing *Ullery*, 67 N.E. at 496).  The Big Tex well operated by Rice Drilling does not cross Tracts 113 and 114, but only runs through adjoining properties.  Thus, according to Rice Drilling, if the Big Tex well has produced any oil or gas originating from Plaintiff's property, that oil and gas must have migrated from Plaintiff's property to the adjoining properties that the wellbore crosses.  (Mot. to Dismiss at 7, ECF No. 11).  And hydrocarbons that have migrated between adjoining lands fall within the scope of the rule of capture,[17] precluding any conversion claim.

Golden Eagle suggests three reasons why the rule of capture may not be applicable to the facts of this case.  First, Plaintiff asserts that "Rice Drilling has effectively prevented Golden Eagle from exercising the only remedy recognized by the common law rule of capture," and thus the rule

---

[16] Rice Drilling provides two sets of arguments in favor of dismissing the conversion claim, depending on whether Golden Eagle intended to allege conversion of severed or unsevered oil and gas.  (*See* Mot. to Dismiss at 6, ECF No. 11).  As Golden Eagle has since stated that "the conversion claim is clearly not based upon conversion of oil or gas that has remained in place," the Court construes the conversion claim to be only about severed oil and gas and, therefore, sets aside Rice Drilling's arguments about unsevered oil and gas.

[17] Golden Eagle asserts that the Ohio courts have concluded that the rule of capture is "outmoded" and "superseded by the regulations limiting drilling based on R.C. Chapter 1509."  (Resp. in Opp'n to Mot. to Dismiss at 12, ECF No. 13 (quoting *Stoll*, 484 N.E.2d at 277)).  It is true that the state appellate court in *Stoll* stated that the rule of capture has been superseded.  But that particular conclusion has not been adopted by its sister courts in Ohio, nor by the Supreme Court of Ohio.  *See, e.g.*, *Yoder v. Stocker & Sitler Oil Co.*, 1994 WL 615954, at *7 (Ohio Ct. App. Sept. 11, 1995) (noting that the decision in *Stoll* "must be confined to its specific facts" and that "the Rule [of Capture] as applied to legally spaced wells" has not been modified); *Barnes*, 68 N.E.3d at 141 (continuing to recognize the rule of capture).  And while Plaintiff may be correct, too, that the absolute rule of capture is outmoded, has harsh consequences, and has been limited, it does not appear that the rule of capture has been overruled or superseded in its entirety; as such, this Court concludes that it is still applicable in Ohio, albeit in a more limited form than the absolute rule first set out in *Kelley v. Ohio Oil Co.*, 57 Ohio St. 317 (1897); *see also Kerns*, 761 F. App'x at 291 (discussing the rule of capture as an extant doctrine whose flaws are addressed by pooling).

should not be applied where a feasible remedy is lacking. (*See* Resp. in Opp'n to Mot. to Dismiss at 13, ECF No. 13). Plaintiff does not, however, cite any case law in favor of this proposition, and the Court is similarly unable to find any case law limiting the rule of capture because a landowner finds herself constrained from exercising the traditional, common law remedy of drilling her own well. (*See id.*). In fact, it does not appear that Plaintiff has already been barred from drilling a well and producing from the Point Pleasant formation below the Property pursuant to its mineral rights lease; Plaintiff may still apply to the ODNR for a permit, and explain in its application why its drilling rights are not precluded by Rice Drilling's permit. The dispute about who may drill the Point Pleasant is ultimately a question of contract interpretation about the scope of Rice Drilling's lease, *cf. Garza Energy*, 268 S.W.3d at 40 (Willett, J., concurring) (noting the viability of contract claims in similar situations involving drainage); Alexis K. Désiré, *Fracturing the Rule of Capture: The Improper Application of the Rule of Capture to Subsurface Intrusions Resulting from Hydraulic Fracturing*, 12 SEATTLE J. TECH., ENVTL., & INNOVATION L. 142, 148–50 (2021) (surveying cases) (noting that the primary modern limitations on the rule of capture are correlative rights and prohibitions against wasteful, reckless, or illegal actions), but it is not a restriction on the applicability of the rule of capture.

Alternatively, Golden Eagle argues that the rule of capture is not so expansive as to "allow a producer without a valid lease to a formation to drain the common pool, to the detriment of all the landowners above that pool." (Resp. in Opp'n to Mot. to Dismiss at 14, ECF No. 13). In other words, Golden Eagle suggests that Rice Drilling has not leased the right to drill and produce from the Point Pleasant formation anywhere in the Big Tex 6 drilling unit; without a valid lease to produce oil and gas from the Point Pleasant formation below the parcels of land adjoining the Property, Rice Drilling cannot assert the rule of capture regarding oil and gas from the formation

below the Property itself.  But the case *sub judice* is not about the scope of Rice Drilling's leasehold

for the other properties that are part of the Big Tex 6 drilling unit.  Nor does Golden Eagle have

standing to challenge Rice Drilling's actions producing from properties where Golden Eagle has

no oil, gas, or mineral rights — that is the responsibility of the landowners of the other properties.[18]

The final argument proposed by Golden Eagle is that the rule of capture applies only to gas

and oil that flows from the plaintiff landowner's land through natural means, such as "the escape,

seepage, or drainage of 'fugacious' minerals which occurs as an inevitable result of the tapping of

a common reservoir."[19]  (Resp. in Opp'n to Mot. to Dismiss at 15, ECF No. 13 (quoting *Young v.

Ethyl Corp.*, 521 F.2d 771, 774 (8th Cir. 1975))).  Golden Eagle then seeks to take a further step

and argue that hydraulic fracturing is used to produce natural gas that is not fugacious, which

would place fracking-induced drainage outside of the realm of the rule of capture.  (*Id.* at 16).

Even more egregious to Golden Eagle are cases where the drainage or seepage of gas was directly

caused by fracking that invaded land beyond the driller's property — in other words, where the

driller acquires gas by fracking its neighbors' land, but claims that the resultant gas naturally

drained into the common pool.  While it does not appear that courts have recognized a general

abrogation of the rule of capture for all hydraulic fracturing cases (or, for that matter, that natural

gas subject to fracking is non-fugacious), *see, e.g.*, *Kerns v. Chesapeake Expl., LLC*, 762 F. App'x

289, 291 (6th Cir. 2019) (discussing the rule of capture in relation to conflicting hydraulic

---

[18] That is, in fact, the subject of another ongoing case before this Court: *J&R Passmore, LLC v. Rice Drilling D LLC*, Case No. 2:18-cv-1587.  Golden Eagle suggests that Rice Drilling's invocation of the *J&R Passmore* case effectively conceded that it may not have a valid lease to produce from the Point Pleasant formation.  (Resp. in Opp'n to Mot. to Dismiss at 14, ECF No. 13).  Although the case does indicate the existence of a legal dispute over that right, it does not demonstrate that Rice Drilling has acknowledged or conceded that it lacks the right to produce; after all, Rice Drilling claims that it should win in the other action because it does have the right to drill the Point Pleasant.

[19] Oil and gas are both considered "fugacious" minerals, which readily move from place to place based on pressure differentials underground.  In other words, they are not static, stuck in place.

fracturing operations in Ohio); *Briggs*, 224 A.3d at 348–49 ("[W]e reject as a matter of law the concept that the rule of capture is inapplicable to drilling and hydraulic fracturing . . . ."), the exceptional cases involving trespassory fracking present a different paradigm.  The few courts that have discussed this issue have held that the rule of capture does not apply to drainage or seepage of natural gas caused by the injection of fracking fluids into another's property.  *See Briggs*, 224 A.3d at 348–49 (applying the rule of capture to hydraulic fracturing only where the fracking "occurs entirely within the developer's property"); *Briggs v. Sw. Energy Prod. Co.*, 245 A.3d 1050, 2020 WL 7233111, at *3 (Pa. Super. Ct. 2020) (same).[20]  In short, the sparse case law on this topic recognizes a conversion claim predicated on natural resources that have been acquired by hydraulic fracturing that invades the plaintiff's property.  And that, in effect, is what Golden Eagle has alleged here: that Rice Drilling invaded Golden Eagle's property, and converted Golden Eagle's oil and gas by way of that physical invasion.  Accordingly, Golden Eagle has adequately stated a claim for conversion.

## IV.    CONCLUSION

For the reasons discussed above, Plaintiff Golden Eagle's Motion for Leave to File Sur-Reply (ECF No. 19) is **GRANTED IN PART and DENIED IN PART**; Defendant Rice Drilling's Motion to Dismiss for Failure to State a Claim (ECF No. 11) is **DENIED**.  Plaintiff is **ORDERED** to amend its Complaint regarding its trespass claim (Count 1) within **fourteen (14) days**.

---

[20] The parties dispute the import of the second *Briggs* case, which was issued by an intermediate state appellate court on remand from the previous *Briggs* case cited.  (*See* Reply in Supp. of Mot. to Dismiss at 9, ECF No. 18; Mot. for Leave to File Sur-Reply at 2, ECF No. 19).  As the lower court and the Supreme Court of Pennsylvania both acknowledge that, in general, the rule of capture applies "so long as no physical invasion of the plaintiff's land occurs," *Briggs*, 224 A.3d at 348 (citing *Jones v. Forest Oil Co.*, 44 A. 1074, 1075 (Pa. 1900)), the Court finds no conflict between the two decisions.

**IT IS SO ORDERED.**

**ALGENON L. MARBLEY**
**CHIEF UNITED STATES DISTRICT JUDGE**

**DATED:  February 10, 2023**